# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2209
_____

United States of America

*Plaintiff - Appellee*

v.

Shelton Oliver

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Sioux City

_____

Submitted: September 23, 2020
Filed: February 11, 2021

_____

Before KELLY, WOLLMAN, and STRAS, Circuit Judges.

_____

KELLY, Circuit Judge.

In August 2018, a jury convicted Shelton Oliver of five counts of drug-trafficking, and the district court imposed a sentence of 25 years' imprisonment (300 months). Oliver appeals, alleging the district court erred by denying his motion for a new trial and applying a sentencing enhancement pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 851. We affirm Oliver's conviction, but we reverse and remand for resentencing.

# I.

Law enforcement officers began investigating Oliver and other drug-trafficking suspects in October 2017 after a man named Ty Olsen died of a multi-drug overdose in Sioux City, Iowa. Officers had information that Oliver sold Olsen heroin shortly before his death. As part of the investigation, law enforcement used a confidential informant named Christopher Hirschauer to buy $50 to $100 worth of heroin from Oliver on four separate occasions. Each of the transactions took place within 1,000 feet of either a park or a school. Oliver was eventually arrested for drug trafficking in March 2018.

In April 2018, Oliver was indicted on one count of conspiracy to distribute heroin and cocaine base, three counts of distributing heroin, and one count of distributing (and aiding and abetting another in distributing) heroin—all within 1,000 feet of a protected location and after having previously been convicted of three felony drug offenses. See 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846, 851, and 860(a). In July 2018, the government filed a notice pursuant to 21 U.S.C. § 851 seeking an enhanced sentence of mandatory life in prison if Oliver was convicted on any of the counts.[1]

The case proceeded to trial in August 2018, and the jury found Oliver guilty on all five counts. Oliver filed two post-trial motions—one requesting a new trial and the other asking the district court to strike the government's § 851 notice. The district

---

[1]The First Step Act later reduced the mandatory minimum term of imprisonment for a conviction under 21 U.S.C. § 841(b)(1)(A)—that is, for a defendant with two or more prior convictions for a serious drug felony or serious violent felony—from life to 25 years. The government filed an amended § 851 notice before the sentencing hearing acknowledging this statutory change and seeking the new 25-year minimum.

court denied both motions. At sentencing in May 2019, the district court found that Oliver had previously been convicted of two serious drug felonies[2] and sentenced him to the 25-year mandatory minimum sentence pursuant to § 841(b)(1)(A). The court noted that, had it not been for the statutory minimum, it would have "probably found a sentence somewhat lower than that, maybe like 240 [months], to be sufficient."

Oliver appeals, arguing that he is entitled to a new trial or, at a minimum, a new sentencing hearing.

## II.

According to Oliver, the cumulative effect of several errors at trial—the admission of certain map exhibits, the submission of an unadmitted exhibit to the jury, the prosecutor's leading questions to a government witness, and the admission of firearm evidence—deprived him of his Sixth Amendment right to a fair trial.

"We review [the] district court's interpretation and application of the rules of evidence de novo," United States v. Hawkins, 796 F.3d 843, 864 (8th Cir. 2015) (cleaned up), and its evidentiary rulings and denial of a motion for a new trial for abuse of discretion. See United States v. Keys, 918 F.3d 982, 985 (8th Cir. 2019); United States v. Morris, 817 F.3d 1116, 1121 (8th Cir. 2016). But we will not reverse a conviction if errors were harmless. United States v. Hyles, 479 F.3d 958, 968 (8th Cir. 2007). "An evidentiary error is harmless when, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict." United States

---

[2]The indictment and § 851 notices listed three prior state-law convictions, but the government conceded at the sentencing hearing that the third conviction did not qualify as a "serious drug felony." Accordingly, only the 2003 and one of the 2006 Illinois drug convictions are at issue in this appeal.

v. Langley, 549 F.3d 726, 729 (8th Cir. 2008) (cleaned up); see also United States v. Mendoza-Mesa, 421 F.3d 671, 672-73 (8th Cir. 2005) ("As to errors not of constitutional magnitude, the government is required to establish that we do not have 'grave doubt' as to whether the error substantially influenced the outcome of the proceedings." (cleaned up)). In the case of cumulative error, this court may reverse "only where the case as a whole presents an image of unfairness resulting in the deprivation of defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." United States v. Baldenegro-Valdez, 703 F.3d 1117, 1124-25 (8th Cir. 2013) (cleaned up).

## A.

Oliver challenges the admission into evidence of a series of maps offered to establish that the controlled buys took place within 1,000 feet of a "protected location." See 21 U.S.C. § 860(a) (subjecting any person who distributes a controlled substance within 1,000 feet of certain protected locations, including schools, colleges, and playgrounds, to heightened penalties); United States v. Gonzalez-Rodriguez, 239 F.3d 948, 953 (8th Cir. 2001) ("[I]n order to obtain a conviction under § 860, [distribution of a controlled substance] within 1000 feet of a school must be charged and proven by the government beyond a reasonable doubt."). Two Sioux City employees—Geographic Information Systems Supervisor Nicholas Bos and Crime Analyst Marie Divis—created the maps to depict the location of each drug transaction relative to nearby parks or schools. Based on statements made by Sergeant Troy Hansen from the Sioux City Police Department, Bos and Divis used mapping software to electronically mark the relevant locations on maps and then noted the distances between them with lines and other labels.

Oliver argues the map exhibits are inadmissible because Bos and Divis's markings (or "tacks") on the maps constitute hearsay. Hearsay is "a statement that

-4-

. . . the declarant does not make while testifying at the current trial or hearing; and . . . [that] a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is generally inadmissible "unless one of several exceptions applies." United States v. Hemsher, 893 F.3d 525, 533 (8th Cir. 2018) (citing Fed. R. Evid. 802). According to Oliver, the markings designating the locations of the parks, schools, and drug transactions "reflect out-of-court statements" made by Sergeant Hansen to Bos and Divis. The government disagrees but does not rely on any hearsay exception. Instead, the government argues that the markings are not hearsay at all because (1) Bos, Divis, and Sergeant Hansen all testified at trial and were subject to cross-examination, and (2) the markings on the maps were generated by computer software, not placed manually.

The fact that Bos, Divis, and Hansen testified at trial does not tell us whether the maps contained hearsay.[3] Rather, the question is whether the markings on the maps are statements that "the declarant d[id] not make while testifying at trial." See Fed. R. Evid. 801(c). Indeed, it is undisputed that, before trial, Sergeant Hansen provided the addresses of the controlled drug transactions and the relevant protected locations to Bos and Divis, who then used that information to create the map exhibits. The government also agrees that it used the maps to show that the controlled buys occurred within 1,000 feet or less of a protected location, an element of all five counts that had to be proven beyond a reasonable doubt. Sergeant Hansen's statements regarding where to place the marks were made out-of-court. And they were then offered by the government at trial for the truth of the matter asserted: the locations of the parks, schools, and drug transactions. Cf. United States v. Ricker, 983 F.3d 987, 995 (8th Cir. 2020) (finding that admission of descriptive cover sheets for various exhibits was improper because the cover sheets contained "previously written

---

[3]Oliver does not argue that the maps themselves are hearsay, only that the markings identifying specific locations on the maps are.

assertions" by law enforcement that were offered to prove the truth of the matters asserted).

We are not persuaded by the argument that the markings cannot constitute hearsay simply because they are computer-generated. Although "[m]achine-generated records usually do not qualify as 'statements' for hearsay purposes," they "can become hearsay when developed with human input." United States v. Juhic, 954 F.3d 1084, 1089 (8th Cir. 2020) (citing Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310-11 (2009)). In Juhic, this court determined that computer-generated reports contained impermissible hearsay because "human statements and determinations were used to classify" the relevant files that were referenced in the reports and later offered against the defendant. Id. at 1088-89. Similarly, here, Sergeant Hansen's out-of-court statements regarding the physical locations of the drug transactions were used to produce the relevant points and distances marked on the maps. Bos also testified that he added a legend to each map describing the relevant locations. See id. at 1089 ("The human involvement in this otherwise automated process makes the notations hearsay.").[4]

But even assuming it was error to admit the maps because they contained hearsay, any error was harmless. See United States v. DeMarce, 564 F.3d 989, 997 (8th Cir. 2009) ("[T]his court will not reverse an erroneous evidentiary ruling if the

---

[4]The government urges us to follow the reasoning in United States v. Lizarraga-Tirado, 789 F.3d 1107, 1109-10 (9th Cir. 2015), in which the Ninth Circuit held that a Google Earth satellite image containing "tacks" marking certain GPS coordinates was not hearsay because although a human had to type in the coordinates, the "tacks" were automatically generated by the software. Lizarraga-Tirado is not only inconsistent with Juhic, it is also factually distinguishable from Oliver's case. The maps at issue here contain more than computer-generated tacks—they also have human-created labels, titles, and lines indicating distance.

error was harmless." (cleaned up)). "An evidentiary error is harmless when, after reviewing the entire record, this court determines that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict." Id. Here, the maps were not the only evidence that showed the proximity of the drug transactions to a protected location. Rather, the maps were duplicative of properly admitted photographs and in-court testimony from Hansen, Bos, and Divis. In short, the jury did not need to rely on the maps to find that Oliver engaged in drug transactions within 1,000 feet of a protected location. See id. (explaining that reversal on the basis of an erroneous evidentiary ruling is appropriate "only if the jury may have been substantially swayed by the improperly admitted evidence" (cleaned up)); United States v. Bercier, 506 F.3d 625, 632 (8th Cir. 2007) ("Evidence erroneously admitted is frequently found to be harmless if it was cumulative, that is, if other evidence to the same effect was properly before the jury." (cleaned up)).

B.

One week after trial, the district court notified the parties that two versions of Government Exhibit 5A (one of the maps) had been sent to the jury room: the admitted version and an earlier, objected-to version. The earlier version of the exhibit was labeled "Distance in Feet from Crime Scene to Park/School." Oliver had objected to the inclusion of the word "crime," the district court sustained the objection, and the final, admitted version was labeled "Distance in Feet from Scene to Park/School." It is undisputed that both parties reviewed the exhibits before they were submitted to the jury and signed the exhibit list without objection.

Submitting an unadmitted exhibit to the jury is an obvious error. See United States v. Rowley, 975 F.2d 1357, 1363 (8th Cir. 1992) ("The exposure of the jury to improper communications or extrinsic material evidence creates a presumption of

prejudice, and therefore a presumption of an infringement of the defendant's Sixth Amendment right to trial by an impartial jury."). And Oliver is right that the unadmitted exhibit contained evidence that was important to the government's case: whether one of the drug transactions took place within 1,000 feet of a protected location. But the evidence properly admitted on this issue at trial was substantial. The jury saw photographs of the locations, heard audio recordings of the controlled buys, and listened to testimony from law enforcement officers who watched the transactions and from individuals who bought drugs directly from Oliver. The inclusion of the word "crime" before the word "scene" was the only difference between the unadmitted and the properly admitted versions of the exhibit. Under these circumstances, the district court's error was harmless because there was "substantial and cumulative" evidence sufficient to overcome the presumption of prejudice. Compare Finnegan v. United States, 204 F.2d 105, 115-16 (8th Cir. 1953) (affirming the denial of a motion for a new trial where defense counsel failed to object to the inclusion of unadmitted exhibits sent to the jury; the unadmitted evidence was cumulative to properly admitted evidence and did not pertain to the count the defendant was convicted of; and nothing else suggested that the defendant was prejudiced), with Osborne v. United States, 351 F.2d 111, 117-19 (8th Cir. 1965) (granting a new trial where the entire unadmitted grand jury transcript—containing significant prejudicial material—was submitted to the jury, and the jury's long and careful deliberations suggested that they likely examined the document).

C.

Oliver also argues that the government engaged in prosecutorial misconduct while examining one of its witnesses, Don Glenn. At trial, another government witness, Jennifer Degeneffe, testified that she was at Oliver's house the night Olsen died, that Olsen had begged Oliver to sell him heroin, and that Oliver later admitted "he couldn't believe the bag he gave [Olsen] killed him." But Glenn contradicted

Degeneffe's account. Glenn testified that Oliver had not claimed responsibility for Olsen's death, and that Degeneffe was not even at Oliver's house the night Olsen died.

Presumably in an effort to bolster Degeneffe's credibility on these points, the prosecutor asked Glenn on direct examination whether Oliver had said "something to the effect of 'I killed my best friend.'" Glenn responded "no, he—," and defense counsel objected to the question as leading before Glenn could say more. The district court sustained the objection, striking both the question and the answer from the record and requesting that the prosecutor rephrase. The prosecutor then asked Glenn what, if anything, Oliver told him about Olsen's death. Glenn testified that after Olsen died, Oliver was "messed up." The prosecutor revisited the issue again on redirect. She said to Glenn: "Then you also—about the statement that [Oliver] made to you that night that he had killed his best friend, you don't remember that." Glenn answered: "[Oliver] never say [sic] that." This time, defense counsel did not object.

On appeal, Oliver argues that the government's question to Glenn on redirect suggested, inaccurately, that Oliver had admitted responsibility for Olsen's death. Because defense counsel did not object to the question at trial, we review for plain error. United States v. Olsund, 453 F.3d 1048, 1059 (8th Cir. 2006) (citing United States v. Olano, 507 U.S. 725, 732-36 (1993)); Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

The leading nature of the question is troubling. The court had already sustained defense counsel's objection to a similar question. See 21 U.S.C. § 841(b)(1)(C). On the other hand, Glenn was unequivocal in his response to the

-9-

prosecutor's question, denying that it was true.[5]  And the district court instructed the jury that questions from lawyers are not evidence.  Cf. United States v. Encee, 256 F.3d 852, 854 (8th Cir. 2001) ("The admission of allegedly prejudicial testimony is ordinarily cured by an instruction to the jury to disregard the testimony." (cleaned up)).  Further, the exchange between the prosecutor and Glenn was brief, the evidence that Oliver distributed drugs was strong, and the jury was not asked to consider whether Oliver was responsible for Olsen's death.  Weighing these considerations, we find that even if the prosecutor's question was improper, it did not affect Oliver's substantial rights.  See, e.g., United States v. Miller, 621 F.3d 723, 730 (8th Cir. 2010) ("If we decide that the government's comments were improper we will then consider the cumulative effect of the improprieties, the strength of the evidence against the defendant, and whether the district court took any curative action." (cleaned up)); Graves v. Ault, 614 F.3d 501, 507 (8th Cir. 2010) ("Even if one or more of the [prosecutor's] comments was improper, reversal is appropriate only when we determine that the jury verdict reasonably could have been affected by the improper comment." (cleaned up)).

D.

At trial, the government played for the jury an audio recording in which Hirschauer, the confidential informant, asked Oliver if he could buy a small pistol from him.  Oliver responded that he had only "big sh**," including a "big a** chopper," like a "NATO gun" that could shoot through walls and kill people.  Oliver then told Hirschauer that when you have a big gun, "you don't give a f*** about the police or nothing."  The government also introduced text messages about gun trafficking exchanged between Oliver and an unidentified third party.  Oliver argues

---

[5]On cross-examination, defense counsel asked Glenn: "[Oliver] never told you that he sold Ty Olsen the drugs that killed him."  Glenn answered: "No, sir."

that the district court erred by admitting firearm-related evidence in his case, which charged only drug offenses.

In overruling Oliver's objection, the district court reasoned that "Oliver's possession of firearms . . . goes to how [he] allegedly conducted drug distribution activities." Because firearms "are often used to safeguard and facilitate drug transactions," they can be "probative of an ongoing drug conspiracy, particularly where . . . they are found in close proximity to [drugs] and other tools of the drug trade." United States v. Burns, 432 F.3d 856, 864 (8th Cir. 2005) (cleaned up). On appeal, Oliver points out, and the government does not dispute, that law enforcement did not seize any firearms from him. There is also nothing in the record to suggest he had a firearm during the controlled buys; and Oliver notes that it was Hirschauer who—acting on instructions from law enforcement—prompted the discussion about firearms. Thus, he argues, the firearm evidence was not probative of the drug charges. He also argues that the firearm evidence was unfairly prejudicial, in part because the description of a "NATO gun" could have "left jurors with the impression that [he] was a violent, dangerous individual with access to especially lethal artillery." See Fed. R. Evid. 403.

"Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). But that rule is circumscribed by Rule 403, which permits courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Applying Rule 403 to determine if evidence is prejudicial . . . requires a fact-intensive, context-specific inquiry." Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 388 (2008).

On this record, the admission of the firearm evidence gives us some pause. Sergeant Hansen testified that it is "not uncommon for drug dealers to have weapons to protect their monies and their drugs," and this court has recognized as much. See, e.g., Burns, 432 F.3d at 864. But the fact that an occurrence is "not uncommon" is not evidence that it occurred in a particular case, and it is the moving party's burden to establish admissibility of the evidence they seek to introduce. Nonetheless, we find that admission of the firearm evidence in this case did not affect Oliver's substantial rights with respect to his ultimate conviction on the federal drug charges—even assuming it was improper. The "testimony and other evidence presented at trial focused primarily" on drug distribution, see United States v. Fleck, 413 F.3d 883, 891 (8th Cir. 2005) (finding the district court's error in admitting evidence of prior bad acts was harmless in part because the evidence at trial focused mostly on the charged crime), and as we have stated, that evidence was strong. The government did not need the firearm evidence to prove its drug-trafficking case against Oliver, and we conclude that it could not have substantially swayed the jury's verdict on the counts of conviction. See United States v. Harry, 930 F.3d 1000, 1007 (8th Cir. 2019) (explaining that even if the district court had erred by allowing testimony regarding the defendant's prior bad acts, it was harmless because "the government presented ample evidence of Harry's intent to distribute"). This is especially true considering that the firearm evidence did not go to any of the essential elements of the charged drug offenses. See United States v. Ramos, 852 F.3d 747, 752, 756-57 (8th Cir. 2017) (holding that erroneous admission of exhibit containing firearm-related evidence was harmless as to defendant's drug convictions due to the "overwhelming evidence" the government presented on the drug charges).

In sum, the district court did not abuse its discretion in denying Oliver's motion for a new trial.

**III.**

Oliver also appeals his sentence. He argues that the district court erred by (1) denying his motion to strike the government's § 851 notice, and (2) finding beyond a reasonable doubt that Oliver had two prior serious drug felonies.

**A.**

Under § 851, courts may not impose a sentencing enhancement "by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court . . . stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851. Here, the government filed two § 851 notices—the first in July 2018 and a second, amended one in May 2019—both of which invoked §§ 841(b)(1)(C) and 860(a).[6] As Oliver points out, that combination of statutes does not prescribe a 25-year minimum term of imprisonment, which the district court imposed pursuant to § 841(b)(1)(A). Specifically, § 841(b)(1)(A) provides: "If any person commits a violation of this subparagraph or of section 849, 859, 860, or 861 of this title after 2 or more prior convictions for a serious drug felony or serious violent felony have become final, such person shall be sentenced to a term of imprisonment of not less than 25 years . . . ." Id. § 841(b)(1)(A). Because the government's § 851 notice failed to cite the proper statutory provision—§ 841(b)(1)(A)—to support the sentence he received, Oliver seeks resentencing.

---

[6]Only the July 2018 § 851 notice is relevant here. "We have held that, for purposes of section 851, the government must file its information before jury selection begins, thus allowing the defendant ample time to determine whether he should enter a plea or go to trial, and to plan his trial strategy with full knowledge of the consequences of a potential guilty verdict." United States v. Velazquez, 410 F.3d 1011, 1017 (8th Cir. 2005) (cleaned up).

We consider de novo whether the government's notice complied with § 851. United States v. Higgins, 710 F.3d 839, 844 (8th Cir. 2013). Under our case law, "strict compliance with § 851 is not required"—only "reasonable notice of the Government's intent to rely on a particular conviction and a meaningful opportunity to be heard." Espinoza v. United States, 745 F.3d 943, 946 (8th Cir. 2014) (cleaned up). By the plain language of § 851, the written notice need only identify the "previous convictions to be relied upon," not the enhanced penalty sought or even the specific statute authorizing the enhanced penalty. See United States v. Chantharath, 705 F.3d 295, 304 (8th Cir. 2013) ("An information complies with the requirements of § 851(a) . . . as long as the information serves to convey the Government's intent to seek an enhancement based on a particular earlier conviction." (cleaned up)). In evaluating the sufficiency of the government's § 851 notice, the key question is "whether the defendant enjoyed full knowledge of the consequences of his prior convictions when making strategic decisions in the course of his defense." United States v. Johnson, 462 F.3d 815, 823 (8th Cir. 2006) (explaining that although the "general procedure" is to file a separate § 851 notice, so long as the government complies "with the constitutional requirements of due process," the § 851 notice can be part of the indictment); see Espinoza, 745 F.3d at 946 ("In applying [§ 851's] requirements, courts are careful not to elevate form over substance.").

On appeal, Oliver does not contend that he lacked adequate notice. He argues only that we should require strict compliance with § 851. Whatever the merits of his argument, we are bound by precedent to reject it.

B.

Finally, Oliver argues that the district court erred by finding he had the requisite "serious drug felonies" to support the statutory enhancement. We review

the district court's factual findings for clear error, <u>United States v. Pratt</u>, 553 F.3d 1165, 1169 (8th Cir. 2009), and its "legal determination that a prior conviction is a predicate offense" de novo, <u>United States v. Vanoy</u>, 957 F.3d 865, 867 (8th Cir. 2020).

Based on the government's § 851 notice, Oliver faced a 25-year mandatory minimum sentence if he had "2 or more prior convictions for a serious drug felony." 21 U.S.C. § 841(b)(1)(A). At sentencing, the government offered evidence of two Illinois drug convictions, one from 2003 and another from 2006. <u>See</u> 21 U.S.C. § 851(c)(1) ("If the person denies any allegation of the information of prior conviction . . . [t]he court shall hold a hearing . . . [and] the United States attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact."). Oliver contends that because the government "failed to prove the precise nature of the prior convictions," it failed to prove that either of them qualifies as a "serious drug felony."

To qualify as "serious drug felonies," Oliver's state convictions must "involv[e] manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance" that is listed on the federal controlled substances schedules. <u>See</u> 18 U.S.C. § 924(e)(2).[7] To "determin[e] whether a prior . . . conviction qualifies as a predicate offense for purposes of [a] federal sentencing enhancement[], we apply a categorical approach that looks to the statutory definition of the prior offense, not to the facts underlying a defendant's prior convictions." <u>United States v. Boleyn</u>, 929 F.3d 932, 936 (8th Cir. 2019) (citing <u>Taylor v. United</u>

---

[7]For a conviction to qualify as a "serious drug felony," the person must also have "served a term of imprisonment of more than 12 months" and must have been "release[d] from any term of imprisonment [on the offense] . . . within 15 years of the commencement of the instant offense." 21 U.S.C. § 802(57). Neither of these requirements is at issue here.

-15-

States, 495 U.S. 575, 600-02 (1990)). When "[u]sing the categorical approach, we focus solely on whether the elements of the crime of conviction sufficiently match the conduct of a serious drug [felony]." Vanoy, 957 F.3d at 867 (citing Shular v. United States, 140 S. Ct. 779, 782 (2020)). "If the state offense sweeps more broadly, or punishes more conduct than the federal definition, the conviction does not qualify as a predicate offense." Id.

At sentencing, the government offered into evidence "Certified Statements of Conviction/Disposition" from the Clerk of the Circuit Court of Cook County, Illinois for both prior convictions. These Certified Statements use shorthand notations that are at times difficult to decipher. Nevertheless, for the 2003 conviction, there is sufficient information to determine that Oliver was convicted of an offense that qualifies as a serious drug felony. The Certified Statement shows two counts relating to the manufacture or delivery of heroin and indicates that they were brought pursuant to 720 Ill. Comp. Stat. 570/407(B)(4)(b)(1) (2002) and 720 Ill. Comp. Stat. 570/401(c)(1) (2002). Oliver argues that the Certified Statement does not "eliminate the possibility" that he pleaded guilty to a lesser offense, but he points to nothing—and we see nothing—on the document to suggest this is what happened. Instead, and regardless of which count Oliver pleaded guilty to, the 2003 conviction ultimately "involved" either the manufacture or delivery of a drug listed on the federal controlled substances schedules: heroin.

Related to the 2006 conviction, the Certified Statement shows that Oliver was charged on three counts: "CRIMINAL DRUG CONSPIRACY," with a citation to "720-570/401;" and two identical charges for "AMT NARC SCHED I/II/SCH/H," with citations to "720-570/407(B)(2)." But nowhere in the Certified Statement is the drug that was the object of any of these offenses identified. And while the document indicates that Oliver pleaded guilty to and was sentenced on "C001," the charges themselves are not numbered as Counts 1, 2, or 3.

-16-

As to the criminal drug conspiracy count, it is reasonable to infer that the citation to "720-570/401" means Oliver was charged with violating 720-570/401 of the Illinois statutory code. See 720 Ill. Comp. Stat. 570/401 (2005) ("[I]t is unlawful for any person knowingly to manufacture or deliver, or possess with intent to manufacture or deliver, a controlled substance other than methamphetamine, a counterfeit substance, or a controlled substance analog."). But the citations associated with the other two counts tell us that Oliver was charged with violating "720-570/407(B)(2)," which is not even a provision that appears in the Illinois statutory code. For these purposes, however, we will assume they too rest on a violation of section 401. See 720 Ill. Comp. Stat. 570/407(a)(1)(B)(2) (2005) (prescribing different penalties for violations of various subsections of section 401).

Applying the categorical approach, we see that 720 Ill. Comp. Stat. 570/401 is broader than the federal definition of a "serious drug felony." See United States v. Ruth, 966 F.3d 642, 645-47 (7th Cir. 2020) (holding that a 2006 conviction for possession with intent to distribute cocaine under 720 Ill. Comp. Stat. 570/401(c)(2) is not a predicate offense under 21 U.S.C. § 841(b)(1)(C) because Illinois's definition of cocaine is categorically broader than the federal one). As the court in Ruth observed, id. at 647, section 401 criminalizes the manufacture or delivery of cocaine, but under Illinois law, cocaine includes "optical, positional, and geometric isomers." 720 Ill. Comp. Stat. 570/206(b)(4) (2000). By contrast, federal law defines cocaine to include only "optical and geometric isomers." 21 U.S.C. § 812, Schedule II(a)(4); Ruth, 966 F.3d at 647. "On its face, then, the Illinois statute is categorically broader than the federal definition." Ruth, 966 F.3d at 647.

Where the state statute is overbroad, we must then ask whether it is "'divisible,' meaning that it 'comprises multiple, alternative versions of the crime.'" United States v. Maldonado, 864 F.3d 893, 897 (8th Cir. 2017) (quoting Descamps v. United States,

-17-

570 U.S. 254, 262 (2013)). If the state statute is divisible, the sentencing court applies the "modified categorical approach," id. at 897-98 (quoting Mathis v. United States, 136 S. Ct. 2243, 2249 (2016)), in order to "determine which statutory phrase was the basis for the conviction." Vanoy, 957 F.3d at 867. We have no difficulty concluding that 720 Ill. Comp. Stat. 570/401 is divisible, as its "structure shows that different drug types and quantities have different punishments." See id. at 868; 720 Ill. Comp. Stat. 570/401 (2005).

To determine whether Oliver's 2006 conviction is a "serious drug felony," therefore, we need to know under which subsection of this divisible statute he was convicted. See Maldonado, 864 F.3d at 898 (explaining that the modified categorical approach permits courts to look "to a limited class of documents . . . to determine what crime, with what elements, a defendant was convicted of"). But neither the type of drug nor the specific subsection of the statute is identified in the Certified Statement. We know that Illinois's definition of cocaine is "categorically broader than the federal definition." Ruth, 966 F.3d at 645-47. If Oliver's 2006 conviction involved cocaine, it would not qualify as a serious drug felony. But the Certified Statement is silent on the specific controlled substance, making it impossible to know whether Oliver's 2006 conviction involved a controlled substance that is listed on the federal controlled substances schedules. See 18 U.S.C. § 924(e)(2)(A)(ii).

Because the government failed to prove beyond a reasonable doubt that Oliver's 2006 Illinois conviction qualified as a "serious drug felony," see id., the 25-year mandatory minimum sentence does not apply and Oliver is entitled to resentencing. See 21 U.S.C. § 841(b)(1)(A).

## IV.

We affirm the denial of Oliver's motion for new trial, but we vacate his sentence and remand to the district court for resentencing based on the existing record.  See United States v. Thomas, 630 F.3d 1055, 1057 (8th Cir. 2011) (per curiam) (because the government understood its burden of proof at the initial sentencing hearing, it "had a full and fair opportunity to present its evidence" and was thus limited to "one bite at the apple").

_____